STATE OF IOWA )
               ) ss
COUNTY OF LINN )

## **AFFIDAVIT**

Your Affiant, Jeffrey A. McGuire, being first duly sworn, deposes and says that:

1.    I am a Special Agent with the Internal Revenue Service (IRS), Criminal Investigation, and have been so employed for over ten years. As a Special Agent with the Internal Revenue Service, my duties and responsibilities have included the conducting of criminal investigations of individuals and businesses that have violated federal laws, particularly those laws found in Title 18, Title 26, and Title 31 of the United States Code.

2.    I have personally received training within the Internal Revenue Service as to the legal principles and statutes representing criminal violations of the United States Code as enumerated in Titles 18, 26, and 31. I have conducted or participated in investigations in connection with my position as a Special Agent of individuals and business entities that have resulted in criminal charges being brought on behalf of the United States of America alleging violations of the Internal Revenue Code, money laundering statutes, and the Bank Secrecy Act.

3.    During the course of my employment, I have conducted or participated in criminal investigations of and related offenses found in Title 18 and Title 31 of the United States Code. Many of these investigations have involved individuals deriving income from illegal sources. These investigations have included investigation of money laundering of proceeds derived from illegal drug activity in violation of Title 21, United States Code §§ 841 et seq. These investigations have also involved the tracing of currency flows from illegal enterprises to assets and other monetary instruments.

4.    My investigations and training have given me knowledge to recognize the various methods used by individuals to conceal their assets and income from the Government. These methods include the following:

a.    The avoidance of checking and savings accounts.

b.    The use of currency wherever possible.

c.    The use of ostensibly legitimate businesses which provide an apparent source of income to hide the illegal activities, which may include the use of business bank accounts.

d.    Conducting financial transactions in amounts under $10,000.00

e.    Purchasing and titling assets in the names of other individuals or entities.

f.    Hoarding large sums of cash.

g.    Using third parties to conduct transactions in an attempt to conceal the true ownership of funds or property involved.

5.    The following information comes from personal knowledge of your affiant, as well as information provided to your affiant by law enforcement agencies participating or assisting in this investigation, including other agents of the Internal Revenue Service-Criminal Investigation, Drug Enforcement Administration, Dubuque Drug Task Force, and the Iowa Board of Pharmacy Examiners.  Many of these agents have been involved in gathering information related to the current investigation for the past several months.

6.    This information is submitted in support of a forfeiture of one hundred thousand four hundred thirty-three dollars and ninety-nine cents ($100,433.99) in proceeds from certificate of deposit (CD) #355001232 at Israel Discount's Branch Bank in Miami, FL; one hundred thousand five hundred forty-three dollars and ninety-nine cents ($100,543.99) in proceeds from certificate of deposit (CD) #355001254 at Israel Discount's Branch Bank in Miami, FL; one hundred thousand five hundred forty-three dollars and ninety-nine cents ($100,543.99) in proceeds from certificate of deposit (CD) #355001265 at Israel Discount's Branch Bank in Miami, FL; one hundred thousand five hundred forty-three dollars and ninety-nine cents ($100,543.99) in proceeds from certificate of deposit (CD) #355001276 at Israel Discount's Branch Bank in Miami, FL; one hundred

thousand five hundred forty-three dollars and ninety-nine cents ($100,543.99) in proceeds from certificate of deposit (CD) #355001243 at Israel Discount's Branch Bank, Miami, FL, and thirty-seven thousand one hundred five dollars and twenty-four cents ($37,105.24) in proceeds from Bank Account #6301082 at Israel Discount's Branch Bank, in Miami, FL, which represent proceeds from the trafficking in controlled substances via the internet, in violation of Title 21, United States Code, Section 801 et seq., and/or represent proceeds traceable to money furnished or intended to be furnished in exchange for controlled substances, in violation of Title 18, United States Code, Section 981, and/or represent proceeds of specified unlawful activities pursuant to 18 U.S.C. § 1956(a)(1)(A), (B), and (C).

7.      Pharmacom International Corporation, aka Pharmacom, LLC (Pharmacom) operates an online prescription service.  The officers of Pharmacom are Orlando Birbragher, Marshall Kanner, and Alexis Avello. The primary web-site for the business is www.buymeds.com, although Pharmacom owns several other domain names.  Customers log onto one of the domain names owned by Pharmacom and place orders for any of a variety of controlled substances.  The customers complete a short health history questionnaire and provide payment information.  The orders are assigned a prescription and batched, waiting to be downloaded from Pharmacom by a contract pharmacy.

8.      Pharmacom established contracts with several physicians, including but not limited to Mario Avello and Mario Diaz, to sign prescriptions for orders placed by online customers through the company's web-site.  According to their contracts, the physicians were paid approximately $18-$20 per script that they signed for a new customer and approximately $8-$10 per script that they signed for a repeat customer.

9.      Pharmacom established contracts with several pharmacies throughout the United States to fill prescriptions that were ordered by online customers through the company's web-site.  The pharmacies downloaded batches of

prescriptions from the Pharmacom web-site and filled the order.  One such pharmacy was Union Family Pharmacy of Dubuque, Iowa.  According to the contract signed by Union Family Pharmacy, Pharmacom paid Union Family Pharmacy $5 per script they filled, and also reimbursed Union Family Pharmacy for their cost of the acquisition of the various drugs.

10.     Pharmacom maintained account #0101012839 at Mellon United National Bank, to which monies were transferred from credit card and other forms of payment.  Payments made to Pharmacom through credit card and other payments were made for the purchase of controlled substances by customers without a valid doctor/patient relationship.  Proceeds from Pharmacom's illegal activities in the sale and distribution of controlled substances were then distributed to other accounts in the name of Pharmacom to other business accounts, doctors, pharmacies or other entities owed and/or controlled by one of Pharmacom's directors.  The transfer of these proceeds does not remove the taint that these proceeds acquired when initially exchanged for controlled substances.  Pharmacom has no other legitimate business activity other than the sale of controlled substances through these internet sales.

11.     On Friday, September 13, 2003, a federal search warrant was executed at the premises of Union Family Pharmacy, a retail pharmacy located at 2541 Central Avenue, Dubuque, Iowa.  Evidence seized pursuant to that warrant indicates that Union Family Pharmacy had a contractual agreement with Pharmacom International, also known as Pharmacom, LLC, and was doing business via the internet under the name Buymeds.com.  The nature of the agreement was generally that Union Family Pharmacy accepted purported prescriptions, and mailed them to the recipients.  A review of the website shows the purported prescriptions were received by Buymeds.com from persons logging onto the Buymeds.com web site, completing a brief questionnaire, indicating what drugs they wish to purchase and identifying a method of payments.  All the prescriptions received by the Union Family Pharmacy from Pharmacom

International, also known as Pharmacom, LLC, d/b/a Buymeds.com
appear to have been transmitted via the internet.

12. DEA regulations do not recognize, as a lawful prescription, electronic
transmissions over the internet of prescriptions from prescribers to
pharmacies. If a pharmacy receives what appears to be a prescription for
a Schedule III-V prescription via the internet, the pharmacy must contact
the prescriber via telephone and receive an oral prescription for the
controlled substance, including the full name and address of the patient,
the drug name, strength, dosage form, quantity prescribed, directions for
use and the name, address and registration number of the practitioner (21
CFR 1306.05(a)). The pharmacist must immediately reduce this oral
prescription to writing (21 CFR 1306.21(a)). Under 21 CFR 1306.21(a), a
pharmacist may dispense schedule III and IV controlled substances only if
the pharmacist has 1) an oral prescription called into the pharmacy by the
physician; 2) a written prescription signed by a physician; or 3) a facsimile
of a written prescription transmitted by the physician to the pharmacy.
The guidance document "Dispensing and Purchasing Controlled
Substances Over the Internet" was published in the Federal Register, April
27, 2001 (66 FR 21181). A copy of this guidance document is available at
the Office of Diversion Control web site:
http://www.deadiversion.usdoj.gov.

13. On September 20, 2003, Federal Express called law enforcement and
stated it had a number of parcels to be returned to Union Family
Pharmacy from customers. Since the parcels contained controlled
substances and the pharmacy board had suspended the license of Union
Family Pharmacy, Union Family Pharmacy was contacted through counsel
to obtain consent for law enforcement to obtain the packages and
contents. With Union Family Pharmacy's consent, law enforcement took
custody of twenty packages from Federal Express. In one of the
packages, a letter was found from Tod B. Linstroth, an attorney in
Madison, Wisconsin, which states, in part, "Union Family Pharmacy sent

Valium and Vicodin to our son Kyle Linstroth, a minor, with a prescription issued by Dr. Carlos Barrera prescribed from information provided over the internet and phone." Also in the package were the controlled substances. Records show these controlled substances were obtained through the Buymeds.com website.

14.   Internet prescription orders filled by Union Family Pharmacy for a one-day period, September 7, 2003, as a sample were subsequently reviewed. On the day examined, they found that Union Family Pharmacy filled 583 purported prescriptions on behalf of Pharmacom, LLC, also known as Pharmacom International, d/b/a Buymeds.com. 225 prescriptions reflected the signature of Mario R. Avello, M.D.; 146 reflected the signature of Mario Alberto Diaz, M.D.; 137 reflected the signature of Armando Angulo, M.D.; and 75 reflected the signature of Carlos Barrera, M.D. 383 prescriptions (about 70%) were written for various brands and strengths of hydrocodone tablets. Hydrocodone is a Schedule III narcotic, and the most widely abused prescription narcotic in the United States. Over one hundred prescriptions were written for benzodiazepines such as Valium and Xanax, which are Schedule IV hypnotics, and widely abused drugs. Only 29 prescriptions (about 5%) were written for other than controlled substances.

15.   During the search of Union Family Pharmacy on September 12, 2003, officers recovered a substantial amount of Schedule III narcotics and records showing shipment of narcotics for approximately 5,172 prescription orders filled through Buymeds.com over a 25-day period. The orders filled by Union Family Pharmacy for the doctors through Buymeds.com were transmitted by internet and not presented in the form or means required by 21 CFR 1306.21(a). Additionally, they do not appear to have been issued in the usual course of professional treatment. Of the approximately 5,172 prescription orders, approximately 4,900 (94.5%) were for controlled substances. The overwhelming majority of controlled substances ordered were hydrocodone products.

16.     DEA Diversion Investigator Judy Williams contacted the Iowa Medical
        Board to inquire about the percentage of controlled substances typically
        prescribed by a physician in the usual and ordinary course of a family
        practice.

        a.      Law enforcement has a letter dated April 7, 2004, from Kent M.
                Nebel, J.D., Director of Legal Affairs for the Iowa Board of Medical
                Examiners.  Mr. Nebel responded to Investigator Judy Williams of
                the Des Moines office of the Drug Enforcement Administration,
                regarding an inquiry into the legal obligation of physicians in the
                State of Iowa with the practice of medicine via electronic means.
                The final paragraph of the letter quotes the policy established by
                the Iowa Board of Medical Examiners in this context:
                "The practice of medicine via electronic means may occur only
                within the context of a previously established doctor-patient
                relationship which includes a physical examination unless it is
                otherwise clinically appropriate."

        b.      I am aware of information received from Mary Ann Wagner, an
                executive with the National Association of Chain Drugs Stores
                (NACDS), indicating that the national average for the quantity of
                controlled substances prescriptions dispensed from a pharmacy as
                a percentage of all drug prescriptions is 11.1% or 88.9% being
                written for non-controlled substances.  The estimate is based upon
                the total number of prescriptions filled in 2003, which was 381
                million, compared to the number of prescriptions filled for controlled
                substances for the top 200 name-brand and top 200 generic
                prescriptions identified as controlled substances by the Drug
                Enforcement Administration.

        c.      I am also aware of publications of the American Medical
                Association (AMA) noted on the AMA internet website.  Of
                particular interest was a press release dated June 19, 2003,

entitled "AMA adopts new guidelines to help physicians ensure safe and secure internet prescribing" in which a paragraph states:

> "The AMA noted that some web sites prescribing medications to patients electronically do not meet minimum standards of medical care.  Many of these companies are not establishing valid patient-physician relationships and continue to dispense drugs based solely on online questionnaires and consultations."

Resolution 921 of the AMA House of Delegates (HOD) introduced by the American Society of Bariatric Physicians and received on November 6, 2003, contains three resolutions:

(1)     that AMA support efforts requiring the establishment of a physician/patient relationship before prescribing medications online;

(2)     that AMA establish policy that it is unethical for a physician to prescribe and dispense medications via the internet without the prescribing physician first examining the patient; and

(3)     that the AMA lobby federal government to enforce existing law and regulations making certain online pharmacies illegal and to prosecute these companies to the full extent of the law to ensure these operations are effectively shut down.

Most recently, a press release dated March 18, 2004, noted testimony provided by Dr. Rebecca J. Patchin, a trustee of the AMA before the House Committee on Government Reform wherein she stated,

> "Illegal internet pharmacies and physicians who sell or dispense prescription medication without prescription—or without a valid patient-physician relationship—are a threat to public health. Consumers who turn to illegal internet pharmacies to fill prescriptions run the risk of exposure to drugs without a valid

patient-physician relationship which further increases the likelihood of abuse."

17.  Law enforcement has consulted with Special Agents of the U.S. Food and Drug Administration (FDA) regarding internet prescribing for pharmaceutical drugs other than controlled substances. I am also aware of 21 U.S.C. § 353(b) referring to prescription by physician; and 21 CFR Part 11 referring to electronic records and electronic signatures. Your affiant finds that 21 U.S.C. § 353(b) essentially requires that for a drug requiring a prescription to be dispensed, a practitioner licensed by law to administer such a drug must execute the prescription. The FDA does not govern the practice of medicine, but defers to the various state licensing authorities; however, for a prescription to be valid, the prescribing practitioner must be licensed by the state or jurisdiction in which he or she practices, and the prescription must be lawfully issued for a legitimate therapeutic purpose and within the normal scope of the practitioner's professional practice. Therefore, if the prescription does not meet the requirement of the state law, the prescription by definition does not meet the requirement of the FDA statute. In the State of Iowa, a pre-established physician-patient relationship including a physical examination is the standard for legitimate medical practice on which a prescription is based.

A.  The non-controlled "prescription" drugs are those drugs, which because of their toxicity or other potential harmful effects, were not safe for use except under the supervision of a practitioner licensed by law. Under 21 U.S.C. Section 353(b) a prescription drug:

> Shall be dispensed only (i) upon written prescription of a practitioner licensed by law to administer such drug, or (ii) upon oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist, or (iii) by refilling any such written or oral prescription if such refilling is authorized by the prescriber either in the original prescription

or by oral order which is reduced promptly to writing and filled by the pharmacist.

B.    For a prescription drug to be lawfully prescribed, the prescription must have been written for a practitioner's patient pursuant to a bonafide doctor/patient relationship.  Section 353(b) further provides that drugs dispensed contrary to the provisions of Section 353(b) are deemed misbranded.

18.    In April 2001, the Drug Enforcement Administration posted a Federal Register Notice giving guidance regarding the dispensing and purchasing of controlled substances over the internet.  The notice states, "Under federal and state law, for a doctor to be acting in the usual course of professional practice, there must be a bonafide doctor/patient relationship.  Completing a questionnaire that is then reviewed by a doctor hired by the internet pharmacy could not be considered the basis for a doctor/patient relationship.

19.    The Iowa Board of Pharmacy has called over 700 listed customers of the website Buymeds.com, to verify purported prescriptions, and have spoken to more than 400 of the individual customers.  Approximately half of the people stated categorically that they had never had any contact with the prescribing physician or the filling pharmacy.  They stated that their only contact was with Buymeds.com through the internet web site.  They would log onto the site, complete a brief questionnaire, indicate the form of payment, and request the drugs they wanted.  The following individuals are some of the customers interviewed by the Iowa Board of Pharmacy who had used the Buymeds.com website to acquire controlled substances which were shipped by Union Family Pharmacy:

A.    Keith Kline of Lancaster, PA, when contacted, stated that he had accessed the web site, but had never ordered anything, but was nevertheless sent a prescription (#973525, dated 8/13/2003, and authorized by Mario Alberto Diaz, M.D.) for hydrocodone with

APAP (generic Vicodin, a Schedule III controlled substance which is a narcotic), quantity 60.

B.      Randy Blau of Scranton, PA, obtained a purported prescription (#974076, dated 8/20/2003, and authorized by Mario R. Avello, M.D.) for hydrocodone with APAP, quantity 60. Blau stated he received the controlled substance but claimed he was sent the wrong strength. He stated he telephoned the pharmacy and doctor's office, and finally was referred to Buymeds.com, with whom he had to fight to get the situation remedied.

C.      Karen Ottinger of Bloomington, IN, stated she received an e-mail after she placed her order, stating that the doctor needed to talk to her before she could receive a prescription for hydrocodone with APAP (generic Lortab), 10 mg/50 mg, 60 tablets, however, she was never contacted by a physician but received the drugs anyway (prescription #974091, dated 8/22/2003 and authorized by Mario R. Avello, M.D.).

D.      Lisa Johnson of Melbourne, FL, received a prescription for hydrocodone/APAP, 7.5 mg/750 mg, 60 tablets (prescription #974453, dated 8/20/2003, and authorized by Carlos Barrera, M.D.) and stated that all she did was answer a few questions and she received the drugs. She thought that someone would contact her, but no one ever did. She expressed some concerns as to whether she actually received the correct drug.

E.      Barbara Dyer-Bennet of Renville, MN, obtained a prescription (#975940, dated 8/22/2003, and authorized by Mario Alberto Diaz, M.D.) and received 80 tablets of Vicodin ES, a Schedule III controlled substance. She stated that on her e-mail to the firm, she stated "I am a responsible individual and have gotten medicine through the internet." That, with the brief medical

history on the internet questionnaire, is the only information she gave and received her drugs.

F.  Gary Conlay of Natchitoches, LA, received 60 tablet of Xanax, a Schedule IV controlled substance which is a hypnotic, and 60 tablets of Fieornal with Codeine, a Schedule III controlled substance which is a narcotic through Buymeds.com.  When contacted by the Board, he stated that he knew it was wrong to do so, and said he would immediately call his personal physician and let him know what he had been acquiring from the internet, that he would never do it again, and that he would gladly provide information to the authorities.  He further stated that he was an attorney and a recovering drug abuser and had been in treatment.  He stated that acquiring drugs through the internet was an easy way to take care of his habit.  When speaking with the pharmacy board representative he stated that he had been clean for six days.

G.  Lisa Ambrozic of Des Moines, IA, received Norco 10, a 10 mg strength of Hydrocodone.  Ambrozic stated that she had no contact with a physician or pharmacist, but only with the internet site Buymeds.com.  The prescription reflects that Ms. Ambrozic suffers from degeneration of cervical spine.  Ms. Ambrozic is, in fact, a recovering narcotics addict and former nurse with no degeneration of her cervical spine.  She told the Board that her only source of drugs was via the internet, since she was so well known in Iowa as a drug addict that no physician in Iowa would prescribe for her, nor would any pharmacy fill a prescription for her.

20.  Several interviews were conducted with employees at Union Family Pharmacy who were involved in the process of filling prescription orders on behalf of Pharmacom International, also known as Pharmacom, LLC, a/k/a Buymeds.com, for customers nationwide.  These employees stated

that they received frequent complaints called in to the pharmacy which included complaints from parents stating that a minor child had inappropriately ordered and received drugs through internet transactions, and one call in particular, from an individual reporting that her neighbor was receiving drugs from Union Family Pharmacy in the mail, which she was then selling on the street. The pharmacy employees stated that they were directed to refer all calls of any nature to the Buymeds.com representative.

21.  On December 1, 2003, a federal administrative subpoena was served at Go Daddy Domains/Domains by Proxy, Inc., 14455 North Hayden Road Suite 219, Phoenix, AZ 85260, phone (480) 505-8800, and it was determined that the list of all the domain names listed in Section III(A) of Attachment A, including Buymeds.com, are currently owned and controlled by Pharmacom International, also known as Pharmacom, LLC, and/or its officers. According to this information, Pharmacom International, also know as Pharmacom, LLC, 601 Brickell Key Drive, Suite 703, Miami, FL 33131, phone (305) 613-3849, and/or its officers registered these domains with the Registrar Service provider Go-Daddy Domains/Domains by Proxy Inc.; that these domains utilize the Internet Service Provider (ISP) RackSpace Hosting; that these domains were registered between the months of January and December 2003 and set to expire between the months of May 2004 and October 2005; and that these domain names are maintained in the .com TLD Registry controlled and administered by VGRS.

22.  On February 24, 2004, I am aware that other investigators typed into a computer connected to the internet and was linked to mypharmacyusa.com and buymeds.com, and learned that drugs such as Vicodin, Lorcet, Lortab and Hydrocodone (III) (mypharmacyusa.com) and Alprazolam (IV), Xanax (IV), Lortab, Fioricet with Codeine, Fiorinal with Codeine (buymeds.com) could all be purchased from these sites. Each of these web sites shows the purported prescriptions are received by

mypharmacyusa.com and buymeds.com from persons logging onto these web sites. Subjects then indicate which drugs they wish to receive, complete a brief questionnaire and identify a method of payment.

23.     Purported prescriptions filled by Union Family Pharmacy for Pharmacom International, also known as Pharmacom, LLC, d/b/a Buymeds.com, indicate that they were authorized by one of four physicians: Carlos Manuel Barrera, M.D., 5799 SW 8th St., Miami, FL; Mario R. Avello, M.D., 363 Aragon Ave., Apt. 413, Coral Gables, FL; Mario Alberto Diaz, M.D., 10124 S.W. Court Street, Miami, FL; and Armando Angulo, M.D., 5821 S.W. 17th Street, Miami, FL. These prescriptions were for primarily Schedule III narcotics such as Vicodin and Codeine, and Schedule IV substances such as Phentermine and Valium. All four of these physicians are registered with the DEA to prescribe controlled substances, and at the addresses listed, except for Dr. Angulo, who is registered at 4999 W. 8th Ave., Suite 26, Hialeah, FL.

24.     During the federal search warrant executed at Union Family Pharmacy on Friday, September 12, 2003, agents recovered a substantial amount of Schedule III narcotics and records showing shipment of narcotics for approximately 8,000 orders filled through Pharmacom International, also know as Pharmacom, LLC, d/b/a Buymeds.com over the 25-day period from August 18 to September 12, 2003. The orders filled by Union Family Pharmacy for the doctors through Buymeds.com were transmitted by internet and not presented in the form or means as required by 21 CFR 1306.21(a), and as noted above, do not appear to have been issued in the usual course of professional treatment.

25.     Your affiant suggests the prescribing of controlled substances purely over the internet and/or telephone without any physical examination does not allow for the establishment of a valid doctor-patient relationship; that a good faith examination is not performed on the patient; and that there is no verification that prescriptions so issued satisfy any legitimate medical purpose or are issued by an authorized practitioner acting in the usual

course of the practitioners professional practice.  Prescribing a controlled substance to a patient without having established a legitimate doctor-patient relationship, and/or without having conducted a good faith medical examination of the patient is not in the usual course of professional treatment and is in violation of 21 U.S.C. § 841(a)(1), 842, and 843(b), and each prescription so executed is separate illegal distribution.

26.    Title 21 CFR 1306.04 provides "a prescription for controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.  The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription.  An order purporting to be a prescription issued not in the usual course of professional treatment...is not [a lawful prescription] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall not be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

27.    A federal search warrant was served on Rackspace.com on December 10, 2003.  Seized pursuant to the warrant were cloned or "ghost" copies of the internet server hard drives utilized by Buymeds.com.  In addition, documentation regarding the business association of Pharmacom, LLC, with Rackspace.com was seized, which information indicated the Buymeds.com and the website www.buymeds.com were owned, operated, and electronically linked to Pharmacom, LLC.  A review of data analyzed from that cloned computer shows clear indications that Pharmacom, LLC maintained a database of customers purchasing pharmaceutical drugs, including controlled substances; a database of purchase cost and retail price for drugs listed for sale; a database of affiliated websites and domains to whom Pharmacom pays commissions; a database of physicians who authorize prescriptions; a database of pharmacies who fill prescriptions for Pharmacom, LLC, a database of

common medical questions and answers; a database of internet credit card payment verification services; and other databases and electronic files indicating that the firm was involved in facilitating the sale of controlled substances via the internet.

28.     A database found on the cloned internet server drive labeled "Pharmacy" contains a list of seventeen pharmacies including Pharmanet, Inc. (further identified with the address 7000 S.W. 97th Ave., Suite 117, Miami, FL); Universal Pharmacy Solutions (listed address of 2727 Philmont Ave., Suite 112, Huntingdon Valley, PA); Union Family Pharmacy; Home; Speed Scripts; TDI Pharmacy; St. Peter's Pharmacy; Dominion Pharmacy; Superior; Maritime Pharmacy; Naturally Yours (4830-A Alameda Rd., Houston, TX); 610 Pharmacy (5496 South Loop East, Houston, TX); Rx Exchange (12361 South Main, Houston, TX); Stella Link; Safeguard; Pharmed; and Lava Services.

29.     On February 1, 2004, an administrative subpoena was issued to Federal Express for account record information for Federal Express account number 277346664, the account number billed to Pharmacom, LLC, also known as Pharmacom International, and utilized by Union Family Pharmacy in Dubuque, IA, to distribute controlled substances to Buymeds.com customers.  Analysis of the documents returned from Federal Express in response to the subpoena revealed that the following pharmacies had utilized the same account number, billed directly to Pharmacom, LLC, also known as Pharmacom International, for making large numbers of distributions to persons named at specific addresses nationwide, in a pattern similar to the distributions made by Union Family Pharmacy:  Universal Pharmacy Solutions (2727 Philmont Ave. #112, Huntingdon Valley, PA 19006; DEA registration AU4049587); St. Peter's Apothecary (9906 Steubenville Pike, Imperial, PA 15126; DEA registration BU8196114); Pharmacy Solutions (168 SE 1st St., Miami, FL 33131; DEA Registration BI7738872); Speed Scripts (6860 SW 81st Terrace, Miami, FL 33134; DEA Registration BS7757036); Pharmanet, Inc. (old address:

7000 SW 97th Ave., Suite 117, Miami, FL 33173, and new address: 8760 SW 132 St., Miami, FL 33176; DEA Registration BP7992173); Superior Pharmacy Group (3321 NW 82nd Ave., Miami, FL 33122-1025; DEA Registration BS7958094); Stella Link Pharmacy (9325 Stella Link Road, Houston, TX 77025-4012; DEA Registration BS8306424); Naturally Yours Pharmacy (4830 Alameda Road, Houston, TX 77004; DEA Registration BN4984062); Rx Exchange Pharmacy (12361 Main St., Houston, TX 77035; DEA Registration BR8493835). These pharmacies were identified as the point of origin for distribution on the distribution record, or as the point to which an undeliverable distribution being returned to its point of origin was delivered. Approximately 40,000 pages of distribution invoices were returned from Federal Express, with each page containing either two or three distribution records, for an approximate total of 100,000 distribution records. For approximately 70,000 distributions, Federal Express was unable to specifically identify the actual point of origin for the distribution, which was reflected only by the bill-to address listed as the shipper.

30.     A data folder was found on the cloned internet server titled "pharmacy" containing .gif files which, when opened, displayed graphic representations of signatures. The images were titled "Alberto Diaz", "Avello", "Doc1", "Doc2", "Ronald Dennie", "signature", and "signature2", and "signature3". Some of these representations duplicated the signature representations found on the downloaded purported prescriptions at Union Family Pharmacy.

31.     A database was found on the cloned internet server titled "customer profiles". This database contained 9,339 individual entries. Each entry consisted of the name, address, telephone number, e-mail address, and other identifying information for persons located throughout the United States. The format of the database and the electronic location of the file, among other indicators, suggests that this file names customers of the www.buymeds.com website during the period of March through April 2003. A similar database found in a different electronic location, and filed

in a different electronic format, contained similar data with 46,498 entries. Identification data for attorney Mark Greiner, a customer mentioned below, is contained in this database. The 9,339 persons listed in the first database are also contained in the second database.

32.    A database entitled "productrecords" shows a list of drugs, including a substantial inventory of controlled substances in Schedules III and IV. The products are identified by, among other data, and SKU number, a product number, a retail price, and a cost listing. In addition, the drugs are noted as units for retail purchase; i.e., SKU "1033" is for a retail unit of 60 tablets of hydrocodone/APAP, 10 mg/500 mg; retail price $150.00, cost $9.00. This package pricing data corresponds with the package items listed for sale on the www.buymeds.com website, including the retail price for the units.

33.    A folder found on the cloned web server drive labeled "perscriptions" contained files which contain PDF data files consisting of multiple formatted prescriptions. The data in these files corresponds with batch purported prescriptions files downloaded at Union Family Pharmacy, and are in the configuration described by employees of Union Family Pharmacy who downloaded such prescription batch files to fill and distribute on behalf of Pharmacom, LLC, also know as Pharmacom International. Each of the purported prescriptions contained a graphic representation of a physician signature which corresponded with the signature representations found in the PDF files described above.

34.    Information provided by Mark Greiner in regard to his purchase of pharmaceutical drugs through internet websites for his personal abuse was reviewed. Mr. Greiner is an attorney, recently employed in Ames, IA, who had purchased controlled drugs from various internet sites for approximately two years until December 2003. When alerted by a prospective client that law enforcement was investigating illegal internet prescribing, Mr. Greiner admitted himself into an in-patient substance abuse treatment facility, and contacted the United States Attorney's Office

in Cedar Rapids, IA.  Mr. Greiner provided documentary evidence to your affiant in the form of e-mail correspondence between himself and various websites regarding the purchase of drugs.  This documentation indicates that Mr. Greiner purchased drugs from several sites associated with, or owned and operated by, Pharmacom, LLC d/b/a Buymeds.com.  Those sites include www.mypainmeds.com.  Purchased drugs were sold through www.buymeds.com.  A review of information seized pursuant to the warrant from the ISP servers of Pharmacom, LLC shows Mark Greiner on the customer database of Buymeds.com.  Mr. Greiner also purchased drugs online from numerous other websites, not directly shown to be associated with Buymeds.com.

35.     The following information describing an undercover buy from Buymeds.com, was relayed to me by Diversion Investigator Judy Williams:

A.      On March 23, 2004, Task Force Officer Thom J. Thielman, acting in an undercover capacity, logged onto internet website, www.buymeds.com.  After verifying personal information previously entered, TFO Thielman indicated he wished to purchase Alprazolam, 1mg, 30 count, at a cost of $129.80; and Hydrocodone/APAP, 7.5/750mg, 60 count, at a cost of $148.50. Following the addition of the Hydrocodone, the screen indicated, "Product adding to cart cannot be bought in unison with product already in cart, continue shopping."  However, order status indicated Alprazolam and Hydrocodone/APAP were purchased.

B.      On March 25, 2004, TFO Thielman received an e-mail notifying him that Dr. Absyldon Nyamekye was awaiting medical records.

C.      On March 29, 2004, a $112 fee for physical examination was debited to the undercover bank account.  TFO Thielman telephoned Buymeds.com and was instructed to contact Examination Management Services, Inc. (EMSI), to arrange for a physical examination.

D.   On March 30, 2004, TFO Thielman called EMSI and was advised that a mobile doctor or other licensed medical person would perform the physical examination.

E.   On April 2, 2004, TFO Thielman called EMSI and a conference call was placed to Buymeds.com to request a mobile examiner.

F.   On April 6, 2004, TFO Thielman called EMSI and was advised the physical examination would be conducted by "Gary, the collector."

G.   On April 8, 2004, TFO Thielman was met in the parking lot outside the Marriott Hotel, West Des Moines, IA, by Gary Russell, LPN, who carried a scale and clipboard. Russell conducted the "physical examination" in public on a bench outside the hotel. Russell took TFO Thielman's blood pressure, weight and pulse. Russell asked TFO Thielman ten questions, with the following answers provided by TFO Thielman:

1.   Do you experience any constant or reoccurring pain?
A: Yes.

2.   Have you had your pain evaluated by a medical doctor?
A: Previously, yes.

3.   Have you noticed any changes in your pain since your last medical examination or in the last six months?
A: No.

4.   Does the intensity of your pain often interfere with your normal daily activities, like walking or working?
A: Yes.

5.   Are over the counter pain relievers adequate to properly control your pain?
A: No.

6.   Have you been told by a medical doctor that chronic pain management including prescription medication is an appropriate treatment option for you?
A: Yes.

7.      Have you experienced adequate pain relief using medication
        as prescribed?
        A: No.

8.      Are you experiencing problems with use of prescribed
        medications?
        A: No.

9.      Do you have access to a local medical doctor who is willing
        to prescribe pain medication as medically indicated is
        currently available?
        A: No.

10.     How tall are you?
        A: 5'10".

H.     On April 19, 2004, TFO Thielman was advised via e-mail that the
       request for Alprazolam was denied; however, the request for
       Hydrocodone was approved.

I.     On April 21, 2004, TFO Thielman took custody of one bottle of
       Hydrocodone/APAP, 7.5/750mg, 60 count.

36.   Pharmacom maintained several bank accounts at Mellon United National
      Bank in Miami, FL.  Those accounts include Pharmacom International
      Corporation, account #0101012839, Pharmacom International Corporation
      Operating Account, account #0101013530, Pharmacom International
      Corporation Expense Account, account #0101013548, Pharmacom
      International Corporation d/b/a Myvaluemeds, account #0101014454,
      Pharmacom International Corporation d/b/a Mymedstoday, account
      #0101014462, and Pharmacom International Corporation d/b/a
      Todaysmeds, account #0101014694.  The account signature cards for
      each account list Orlando Birbragher as President and Marshall Kanner as
      Secretary.  An analysis of the records indicates that account #0101012839
      was the primary business account for Pharmacom through which most
      monies passed.  A deposit analysis of the account revealed that over $32

million ($32,042,426.38) was deposited into the account from March 2003 through March 31, 2004.

37.   An analysis was conducted of the Pharmacom accounts maintained at Mellon United National Bank (Mellon Bank). Significant account activity started in March 2003, which appears to be when Pharmacom's internet pharmacy business got started. It appears that Pharmacom used Mellon Bank account #0101012839 as the primary account (Primary Account) for collecting and distributing funds. Funds were received mostly from credit card vendors such as American Express, Discover Business Services, and CardReady International, which represented payments from the various online customers. Those funds were deposited into the Primary Account. Funds were disbursed to several other accounts for various purposes, as will be described in the following paragraphs.

38.   Mellon Bank account #0101013530, the operating account (Operating Account), was utilized to make payments to the various physicians and contract pharmacies. The transfers from the Primary Account to the Operating Account varied in frequency and amounts, but there were approximately 130 transfers of funds from April 2003 through March 2004. All but one were even-dollar amounts such as $20,000, $50,000, $100,000, $200,000, as high as $350,000. Only ten of the transfers were for an amount less than $50,000. The transfers from the Primary Account to the Operating Account from April 2003 through March 2004 totaled $14,256,000.00. The Operating Account was used to make payments to various contract physicians and pharmacies, including Dr. Avello and Dr. Diaz, and Union Family Pharmacy in Dubuque, IA. There are several wire transfers from the Operating Account to various pharmacies located around the United States, including Union Family Pharmacy.

39.   There are a series of checks issued from the Operating Account to Drs. Diaz and Avello in exact $9,000 and $10,000 increments, respectively. The notation in the memo section of many of the checks payable to the doctors reads "500 scripts" indicating payment for prescriptions. There

are also a series of checks issued from the Operating Account to Orlando Birbragher, Marshall Kanner, and Alexis Avello, the officers of Pharmacom, in exact $8,000 increments.  The notation in the memo section of many of the checks payable to the officers of Pharmacom generally shows a range of dates of one week, and sometimes includes the word "draw."  Birbragher stated in an interview with IRS S/A Chris Orlando that each of the doctors (Diaz and Avello) requested they be paid in $9,000 and $10,000 checks, respectively.  Birbragher advised that he stopped issuing checks to the doctors in $9,000 and $10,000 increments in July 2003 after he was contacted by Mellon United National Bank regarding the activity.  Birbragher stated that the $8,000 checks payable to himself, Alexis Avello, and Marshall Kanner are considered distributions from Pharmacom.  Birbragher stated that the three officers of Pharmacom receive weekly distributions in addition to a salary.

40.    Mellon Bank account #0101013548, the expense account (Expense Account), was utilized by the officers of Pharmacom to pay for travel and other expenses.  There were approximately 54 transfers of funds from the Primary Account to the Expense Account from March 2003 through March 2004.  Three of the transfers were for $5,000, the rest of the transfers were $10,000 each.  The transfers from the Primary Account to the Expense Account from March 2003 through March 2004 totaled $525,000.00.  There are approximately three transfers of funds from the Expense Account to the Operating Account from December 2003 through March 2004, totaling $185,000.00.

41.    Mellon Bank account #0101014462, Pharmacom International Corporation d/b/a Mymedstoday account (Mymedstoday Account), was utilized by the officers of Pharmacom to pay for travel and other expenses.  There were approximately 39 transfers of funds from the Primary Account to the Mymedstoday Account from July 2003 through March 2004.  One of the transfers was for $5,000, one was for $50,000, and the rest of the transfers were $10,000 each.  The transfers from the Primary Account to

the Mymedstoday Account from July 2003 through March 2004 totaled $425,000.00.

42.     Mellon Bank account #0101014454, Pharmacom International Corporation d/b/a Myvaluemeds account (Myvaluemeds Account), was utilized by the officers of Pharmacom to pay for travel and other expenses.  There were approximately 38 transfers of funds from the Primary Account to the Myvaluemeds Account from July 2003 through March 2004.  One of the transfers was for $50,000, the rest of the transfers were $5,000 each.  The transfers from the Primary Account to the Myvaluemeds Account from July 2003 through March 2004 totaled $235,000.00.

43.     Mellon Bank account #0101014694, Pharmacom International Corporation d/b/a Todaysmeds account (Todaysmeds Account), was utilized by the officers of Pharmacom to pay for travel and other expenses.  There were approximately 42 transfers of funds from the Primary Account to the Todaysmeds Account from July 2003 through March 2004.  Four of the transfers were for $10,000, the rest of the transfers were $5,000 each. The transfers from the Primary Account to the Todaysmeds Account from July 2003 through March 2004 totaled $230,000.00.

44.     Mellon Bank account #0101012094 and account #0101012748 are both in the name of BK Generalli.  Florida Department of State records show that Orlando Birbragher and Marshall Kanner are the officers of BK Generalli. The Primary Account was opened with a transfer of funds from this BK Generalli account #0101012094.  Beginning in March 2003, there were approximately 105 transfers of funds from the Primary Account to the BK Generalli accounts.  All but 13 of the transfers were $10,000 each.  The transfers from the Primary Account to the BK Generalli accounts from March 2003 through March 2004 totaled $1,506,601.23.  There were also approximately six transfers of funds from the BK Generalli account #0101012094 to the Operating Account from July 2003 through March 2004 totaling $510,000.00.

45.     Mellon Bank account #0105000863 is in the name of Susan Kanner.
        Susan Kanner is the wife of Marshall Kanner, an officer of Pharmacom.
        There are at least two transfers of funds from the Primary Account to
        Kanner's account totaling $150,000.00.

46.     Mellon Bank account #0058614779 is in the name of Orlando Birbragher.
        Beginning in August 2003, there are a series of approximately 25 transfers
        of funds from the Primary Account to Birbragher's account. Each of the
        transfers was in the amount of $50,000. The transfers from the Primary
        Account to Birbragher's account from August 2003 through March 2004
        totaled $1,250,000.00.

47.     Mellon Bank account #0105000244 is in the name of Marshall Kanner.
        Several transfers of funds were made to Mellon Bank account
        #0104000863, which was seized by a federal seizure warrant on May 19,
        2004, from this account. There were also several transfers of funds from
        Mellon Bank account #010110196, which was seized by a federal seizure
        warrant on May 20, 2004, to this account. Beginning in December 2003,
        there were several deposits to this account for a deposit item entitled
        "Pharmacom Intern Quickbooks." The following deposits showed
        Pharmacom as the source: $4,892.09 on 12/5/2003, $5,321.33 on
        12/22/2003, $4,892.10 on 1/2/2004, $4,892.10 on 1/16/2004, $7,642.39
        on 2/13/2004, $7,642.40 on 2/27/2004, $7,642.39 on 3/12/2004, and
        $7,642.41 on 3/26/2004.

48.     Marshall and Susan Kanner maintain four accounts at SunTrust Bank in
        Miami, FL. The accounts are the Susan Kanner Revocable Trust, account
        #1000013831820, Marshall Kanner Revocable Trust, account
        #1000013831572, Marshall Neil Kanner or Susan Kanner, account
        #1000014579535, and Marshall Neil Kanner or Susan Kanner, account
        #1000014579543. Beginning in November 2003, there are a series of
        transfers of funds from the Mellon Bank Primary Account to the various
        Kanner accounts at SunTrust Bank. Nearly all of the transfers were in the
        amount of $50,000, or occasionally in the amount of $100,000. The

transfers from the Primary Account to Marshall Kanner's account from November 2003 through March 2004 totaled $1,030,000.00. There are multiple transfers back and forth between the various Kanner accounts maintained at SunTrust Bank.

49.     On May 21, 2004, subsequent to federal search warrants being conducted at Pharmacom and other locations on May 20, 2004, Marshall and Susan Kanner opened another account at SunTrust Bank. Account #1400024356965 was opened with a $20,000 transfer of funds from SunTrust account #1000013831820, which was seized pursuant to a federal seizure warrant on May 28, 2004.

50.     During the execution of a federal search warrant at Pharmacom on May 20, 2004, I spoke with Emin Ramiz Gurbanov, who is the bookkeeper for Pharmacom. Among other duties, Gurbanov is responsible for handling the banking activity for Pharmacom. Gurbanov stated that in March and April 2004, Pharmacom was in the process of transferring its banking activity from Mellon Bank to other banks, including Union Planters Bank and the First Bank of Puerto Rico in the Virgin Islands. Gurbanov also stated that despite multiple corporate entities, the only source of income at the present time is from Pharmacom. Gurbanov further stated that Birbragher and Kanner take a $50,000 weekly personal draw from the Pharmacom business accounts, in addition to their salary.

51.     Orlando and Alexis Birbragher maintain multiple accounts at Union Planters Bank in Miami, FL. Union Planters Bank account #9601208052 was opened in February 2004 with a wire transfer of $50,000 from Pharmacom International Corporation. There were additional $50,000 wire transfers to account #9601208052 from Pharmacom International Corporation on 3/8/2004 and 3/18/2004. Union Planters Bank account #9601208276 was opened in April 2004 with a deposit of $50,000. There were additional deposits of $74,000 on 4/30/2004 and $58,000 on 5/10/2004.

52.   Marshall Kanner maintains an account at Union Planters Bank as well.
      Account #9601208011 was opened in February 2004.  In April 2004, the
      account received a wire transfer of $50,000 from Pharmacom International
      Corporation.

53.   Orlando Birbragher maintains an account at Israel Discount Bank of New
      York in Miami, FL.  Israel Discount Bank account #6301082 is in the name
      of Orlando and Alexis Birbragher.  Beginning in April 2003, there are a
      series of approximately eight transfers of funds from the Mellon Bank
      Primary Account to Birbragher's account at Israel Discount Bank.  The
      transfers from the Primary Account to Birbragher's account from April
      2003 through March 2004 totaled approximately $81,000.00.  Evidence
      obtained during the search warrant conducted at Pharmacom on
      5/20/2004 revealed that this account was used for direct deposit of
      Birbragher's paychecks from Pharmacom, according to corporate time
      sheet files.  Orlando and Alexis Birbragher also maintain several
      certificates of deposit at Israel Discount Bank.  Certificates 355001232,
      355001243, 355001254, 355001265, and 355001276 are in the names of
      Orlando Birbragher, and/or Alexis Birbragher, David Birbragher, Karla
      Birbragher and Andres Birbragher.  Irma Torres of Israel Discount Bank
      advised that each of the certificates is in the amount of $100,000.00 and
      each was purchased on 12/18/2003 by debiting account #6301082 for the
      amount of each certificate.

54.   Pharmacom, LLC maintains accounts at First Bank of Puerto Rico, in St.
      Thomas, U.S. Virgin Islands.  Beginning in April 2003, there are a series of
      approximately eight transfers of funds from the Mellon Bank Primary
      Account to the Pharmacom, LLC accounts.  The transfers from the
      Primary Account to the Pharmacom account from April 2003 through
      November 2003 totaled approximately $120,000.00.  First Bank of Puerto
      Rico accounts #7191385377, 7191385366, and 7195102607 were seized
      by federal seizure warrants on May 21, 2004.  Evidence obtained during a
      federal search warrant conducted at Pharmacom on May 20, 2004,

revealed two additional accounts at First Bank of Puerto Rico. A wire transfer of $500,000 from First Bank account #7195102607 was made on 2/2/2004 to First Bank account #7191385388, an account in the name of Marshall Kanner. A wire transfer of $50,000 from First Bank account #7195102607 was made on 2/18/2004 to First Bank account #7191389205, an account in the name of Orlando Birbragher.

55.   Evidence obtained during the Pharmacom search warrant on 5/20/2004 also shows a wire transfer of $500,000 from First Bank of Puerto Rico account #7195102607 was made on 2/2/2004 to Northern Trust Bank of Florida account #1740006015, an account in the name of Orlando Birbragher.

56.   Alexis Avello maintains multiple accounts at SouthTrust Bank in Miami, FL. Beginning in December 2003, there are a series of approximately 17 transfers of funds from the Mellon Bank Primary Account to SouthTrust account #54834752, an account in the name of Alexis Avello. All but three of the transfers were in the amount of $50,000. The transfers from the Primary Account to Alexis Avello's account from December 2003 through March 2004 totaled $932,185.00. Evidence obtained during the search warrant conducted at Pharmacom on 5/20/2004 revealed that this account was used for direct deposit of Avello's paychecks from Pharmacom, according to the corporate time sheet files. Other evidence obtained from the search warrant conducted at Pharmacom revealed a check written from the First Bank of Puerto Rico account #7191385377 was made payable from Pharmacom to Alexis Avello. Check #1019, written on 1/24/2004 in the amount of $20,000.00, was deposited into SouthTrust account #54834862.

57.   Based on the evidence set forth, your affiant believes there is probable cause to seize the defendant property identified as: one hundred thousand four hundred forty-three dollars and ninety-nine cents ($100,433.99) in proceeds from certificate of deposit (CD) #355001232 at Israel Discount's Branch Bank in Miami, FL; one hundred thousand five hundred forty-three

revealed two additional accounts at First Bank of Puerto Rico. A wire transfer of $500,000 from First Bank account #7195102607 was made on 2/2/2004 to First Bank account #7191385388, an account in the name of Marshall Kanner. A wire transfer of $50,000 from First Bank account #7195102607 was made on 2/18/2004 to First Bank account #7191389205, an account in the name of Orlando Birbragher.

55. Evidence obtained during the Pharmacom search warrant on 5/20/2004 also shows a wire transfer of $500,000 from First Bank of Puerto Rico account #7195102607 was made on 2/2/2004 to Northern Trust Bank of Florida account #1740006015, an account in the name of Orlando Birbragher.

56. Alexis Avello maintains multiple accounts at SouthTrust Bank in Miami, FL. Beginning in December 2003, there are a series of approximately 17 transfers of funds from the Mellon Bank Primary Account to SouthTrust account #54834752, an account in the name of Alexis Avello. All but three of the transfers were in the amount of $50,000. The transfers from the Primary Account to Alexis Avello's account from December 2003 through March 2004 totaled $932,185.00. Evidence obtained during the search warrant conducted at Pharmacom on 5/20/2004 revealed that this account was used for direct deposit of Avello's paychecks from Pharmacom, according to the corporate time sheet files. Other evidence obtained from the search warrant conducted at Pharmacom revealed a check written from the First Bank of Puerto Rico account #7191385377 was made payable from Pharmacom to Alexis Avello. Check #1019, written on 1/24/2004 in the amount of $20,000.00, was deposited into SouthTrust account #54834862.

57. Based on the evidence set forth, your affiant believes there is probable cause to seize the defendant property identified as: one hundred thousand four hundred thirty-three dollars and ninety-nine cents ($100,433.99) in proceeds from certificate of deposit (CD) #355001232 at Israel Discount Bank, New York, NY; one hundred thousand five hundred forty-three

dollars and ninety-nine cents ($100,543.99) in proceeds from certificate of deposit (CD) #355001254 at Israel Discount Bank, New York, NY; one hundred thousand five hundred forty-three dollars and ninety-nine cents ($100,543.99) in proceeds from certificate of deposit (CD) #355001265 at Israel Discount Bank, New York, NY; one hundred thousand five hundred forty-three dollars and ninety-nine cents ($100,543.99) in proceeds from certificate of deposit (CD) #355001276 at Israel Discount Bank, New York, NY; one hundred thousand five hundred forty-three dollars and ninety-nine cents ($100,543.99) in proceeds from certificate of deposit (CD) #355001243 at Israel Discount Bank, New York, NY, and thirty-seven thousand one hundred five dollars and twenty-four cents ($37,105.24) in proceeds from Bank Account #6301082 at Israel Discount Bank, New York, NY, as proceeds of the illegal distribution of controlled substances and are, therefore, subject to forfeiture pursuant to 18 U.S.C. § 981(b), and/or18 U.S.C. § 1956(a)(1)(A), and/or 21 U.S.C. § 881(a)(6).

I declare under penalty of perjury that the above-foregoing facts and circumstances are true and correct to the best of my knowledge and belief.

Executed on this 8th day of December, 2004.

Jeffrey A. McGuire
Internal Revenue Service Special Agent
St. Louis Field Office
Cedar Rapids Post-of-Duty

Subscribed and sworn to before me on this 8th day of December, 2004, by Jeffrey A. McGuire, IRS Special Agent.

Idona S. Patton
Notary Public
In and for the State of Iowa

1-16-07